UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DONALD SHAPIRO and DR. DONALD SHAPIRO, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>CYNOSURE, LLC, and GREENWOOD EQUIPMENT FINANCE LLC,<br><br>Defendants. | No. 1:23-cv-10947-JEK |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO ENFORCE A SETTLEMENT AGREEMENT

**KOBICK, J.**

Dr. Donald Shapiro, a Florida optometrist, brought this action alleging that defendant Cynosure, LLC made misrepresentations that induced him to purchase a machine that was not approved by the Food and Drug Administration for its intended use. Also named as defendant is Greenwood Equipment Finance LLC, the entity that lent Dr. Shapiro funds to finance the purchase of the machine. Pending before the Court is Dr. Shapiro's motion to enforce a settlement agreement that he purportedly reached with Cynosure while the case was in discovery. Because one of the three provisions of the offer made by Cynosure to Dr. Shapiro is an agreement to undertake additional settlement discussions with Greenwood, the accepted offer is a mere agreement to reach an agreement, not a binding contract. The motion to enforce will, accordingly, be denied.

## BACKGROUND

In the summer of 2022, the complaint alleges, Dr. Shapiro spoke with a sales representative from Cynosure about the TempSure RF Generator with TempSure Envi face application and

FlexSure Applicator kit. ECF 1, ¶ 13. The sales representative allegedly told him that this product is used for dry eye treatment and that Cynosure could provide Dr. Shapiro with training on how to use the product for that purpose. *Id.* ¶¶ 13-16, 18-21. According to the complaint, Cynosure's sales representative failed to inform Dr. Shapiro that the product is not approved by the Food and Drug Administration ("FDA") for dry eye treatment. *Id.* ¶ 22. Dr. Shapiro agreed to purchase the product from Cynosure for $179,999 and paid for the product through a financing agreement with Greenwood for $191,785. *Id.* ¶¶ 25-26. After Dr. Shapiro received the product, Cynosure's trainer informed him that Cynosure could not provide dry eye treatment training because the product is not approved by the FDA for treatment of that condition. *Id.* ¶¶ 27-28. Dr. Shapiro alleges that he would not have purchased Cynosure's product had he known that Cynosure would not train him on its use for dry eye treatment, but Cynosure has refused to take the product back. *Id.* ¶¶ 31-32. In April 2023, Greenwood sued Dr. Shapiro in Florida state court to enforce the terms of the financing agreement. *Id.* ¶ 34.

Dr. Shapiro filed this diversity action on May 1, 2023 against Cynosure and Greenwood.[1] He alleges that Cynosure misrepresented its product as treating dry eye, and that he entered into the purchase agreement with Cynosure and the financing agreement with Greenwood based on those misrepresentations. *Id.* ¶ 35. The complaint asserts three claims: fraud in the inducement against Cynosure (Count I), a violation of M.G.L. c. 93A against Cynosure (Count II), and rescission against Greenwood (Count III). *Id.* ¶¶ 36-60. Greenwood, in turn, asserts a crossclaim against Cynosure for contractual and common law indemnification. ECF 28, at 8-10.

---

[1] Dr. Shapiro later moved to join Dr. Donald Shapiro, Inc., as a plaintiff because it is a signatory to the financing agreement with Greenwood. *See* ECF 23. The Court granted that motion after confirming that it had subject matter jurisdiction under 28 U.S.C. § 1332(a). *See* ECF 22, 25-26.

In November and December 2023, in the middle of discovery, counsel for Dr. Shapiro and counsel for Cynosure exchanged emails concerning the prospect of settlement. *See* ECF 35-1. On November 7, 2023, Dr. Shapiro's counsel wrote:

> The following summarizes what my client is hoping to achieve:
>
> - Return the products to Cynosure or Greenwoods, at their expense
> - Reimbursement for the leased storage facility where the products are stored (my client has not used the products in his practice)
> - Rescission of the debt obligation to pay for the products
> - Reimbursement of any money paid toward the purchase of the products (which I believe is nominal)
> - Reimbursement of reasonable attorney's fees and expenses (my fees and expenses).
>
> Basically money to reimburse his out of pocket expenses, the debt or obligation to pay goes away, and the product is taken. My client's ask is less than the cost of the discovery and litigation.
>
> If your client is [amenable], we can talk more specifics. Between your client and Greenwoods, my guess is that they can figure out a way to deal with the product return and contract cancellation etc. Please let me know your thoughts.

*Id.* On November 30, 2023, counsel for Cynosure responded to counsel for Dr. Shapiro as follows:

> I thought I'd reach out to you before our 3:30 call today because my client has given me authority to try and settle the matter. Cynosure's counter is:
>
> 1. They will take the machine back, and pay for shipping;
> 2. They will work with Greenwood to settle the outstanding balance [owed] them, as I understand it Dr. Shapiro has made only 1 payment on the account.
> 3. They will waive the $10,000.00 they gave to Dr. Shapiro as a rebate in January, to use towards his expenses and legal fees.
>
> Please let me know if this settlement is agreeable to your client. If so I will prepare a settlement agreement including a confidentiality provision.

*Id.* Dr. Shapiro's counsel replied succinctly on December 5, 2023:

> My client will agree to these terms. Accepted. Please send me a draft settlement agreement and arrangements to pick up the machine so my client can mitigate his storage cost.

3

*Id.* Thirteen minutes later, counsel for Cynosure followed up with Dr. Shapiro's counsel as follows:

> Let me talk to my client in the morning and work out the logistics. I also have to touch base with [counsel for Greenwood to] see how we can wrap up his part of the case. Is your client going to withdraw against Greenwoods under this settlement?
>
> I've already started drafting a settlement agreement, if Greenwoods is going to be a party to the agreement I will have to revise it.
>
> Let me know your thoughts on Greenwoods and I will speak with my client.
>
> Thanks for getting this done hopefully we can hammer out the details in the next few days.

ECF 38-2, at 1. Two minutes later, Dr. Shapiro's counsel replied: "Yes, its global. Lawsuit goes away. Everyone moves on." *Id.*

The following day, on December 6, 2023, counsel for Cynosure wrote the following email to Greenwood's attorney:

> [Counsel for Dr. Shapiro] and I have reached a settlement in principle with regard to Dr. Shapiro's claims. Part of the agreement includes Cynosure settling the debt owed by Dr. Shapiro and or his company for the return of the equipment. My client is going to reach out to yours to discuss this resolution. I wanted to keep you in the loop and ask you to confirm with your client that they will authorize you to withdraw your cross-claim against Cynosure as well as the suit in Florida against Dr. Shapiro, if it is still pending. I have prepared a settlement agreement that I will circulate for everyone's review once our clients have discussed resolution of this debt.
>
> Please let me know when you are able to confirm whether your client is on board with this settlement proposal. We would like to resolve this as quickly as possible to avoid any additional carrying costs for Dr. Shapiro.

ECF 38-3, at 2.

Despite subsequent negotiations, Cynosure and Greenwood were unable to reach an agreement on how to settle Dr. Shapiro's outstanding debt. ECF 46, ¶¶ 17-19. Dr. Shapiro subsequently moved to enforce what was, in his view, a settlement agreement reached with Cynosure on December 5, 2023. Cynosure opposed that motion. At the hearing on the motion, Dr.

4

Shapiro and Cynosure agreed that the Court need not hold an evidentiary hearing and should resolve the motion based on the documentary record.

## DISCUSSION

"[A] party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply." *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008). Before enforcing a settlement, however, the court "must ascertain whether or not a binding agreement in fact existed." *Malave v. Carney Hosp.*, 170 F.3d 217, 222 (1st Cir. 1999). "Where, as here, the material facts are not in dispute, it is up to the court to determine whether a binding agreement has been reached." *D'Agostino v. Fed. Ins. Co.*, 969 F. Supp. 2d 116, 126 (D. Mass. 2013) (applying Massachusetts law). As the party seeking to enforce a settlement agreement, Dr. Shapiro bears the burden of proving the existence of a contract. *See Moore v. La-Z-Boy, Inc.*, 639 F. Supp. 2d 136, 140 (D. Mass. 2009) (applying Massachusetts law).

### I.  Choice of Law.

Before turning to the enforceability of the settlement between Dr. Shapiro and Cynosure, the Court must determine the source of law that governs the interpretation of that agreement. *See In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 14 (1st Cir. 2012). Courts "engage in a two-part inquiry" to answer the source-of-law question. *Id*. First, the court must "evaluate whether under the *Erie* doctrine, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal or state law governs the matter." *Id.* In this diversity action, state law controls because, "[a]s a general matter, 'interpreting [settlement] agreements and their scope is a matter of state contract law.'" *In re Volkswagen*, 692 F.3d at 15 (quoting *Fábrica de Muebles J.J. Álvarez, Inc. v. Inversiones Mendoza, Inc.*, 682 F.3d 26, 33 (1st Cir. 2012)).

"Second, if state law governs, and a choice of law must be made, [the court must] determine which state's law applies by applying the choice of law rules of the forum state." *Id.* at 14. When the parties "have agreed to the choice of law," the court "is free to 'forego an independent analysis and accept the parties' agreement.'" *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 20 (1st Cir. 2003) (quoting *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991)). At the hearing on Dr. Shapiro's motion, the parties agreed that Massachusetts law governs this dispute. Counsel for Dr. Shapiro also represented that the underlying purchase agreement contains a choice-of-law provision stating that Massachusetts law controls. Further, both Cynosure and Dr. Shapiro have relied on Massachusetts law in supporting and opposing the motion to enforce. *See Williams v. Astra USA, Inc.*, 68 F. Supp. 2d 29, 36 (D. Mass. 1999) (applying Massachusetts law where the parties cited only Massachusetts law and did not raise any conflict-of-laws issue); *Blocher v. Blocher*, No. 12-cv-10174-GAO, 2013 WL 5329029, at *4 n.6 (D. Mass. Sept. 19, 2013) (same).

Guided by "the parties' reasonable agreement that Massachusetts law controls," *Martins v. Vermont Mut. Ins. Co.*, 92 F.4th 325, 328 (1st Cir. 2024), the Court will apply Massachusetts contract law to determine whether Dr. Shapiro and Cynosure entered into an enforceable settlement agreement. *See Bos. Exec. Helicopters, LLC v. Maguire*, 45 F.4th 506, 514 (1st Cir. 2022) ("Massachusetts law plainly governs" settlement agreement interpretation); *Fid. & Guar. Ins. Co.*, 541 F.3d at 5 ("In this diversity case [interpreting a settlement agreement], we apply Massachusetts contract law.").

II.   **Enforceability of the Settlement Agreement.**

Under Massachusetts law, a contract is formed if there is an offer specifying the material terms, acceptance of those terms, and consideration. *See Doe v. Trustees of Boston College*, 892

F.3d 67, 89 (1st Cir. 2018) (citing *Quinn v. State Ethics Comm'n*, 401 Mass. 210, 216 (1987)). For a contract to be enforceable, "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Lambert v. Fleet Nat. Bank*, 449 Mass. 119, 123 (2007) (internal quotation marks omitted). "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000). Nevertheless, where "an alleged agreement 'is silent as to material matters important in its interpretation for the ascertainment of the obligations of the parties,' the contract may be too indefinite to enforce." *Vacca v. Brigham & Women's Hosp., Inc.*, 98 Mass. App. Ct. 463, 468 (2020) (quoting *Held v. Zamparelli*, 13 Mass. App. Ct. 957, 958 (1982)); *see also Gibson Found., Inc. v. Norris*, 88 F.4th 1, 12 (1st Cir. 2023) ("'All the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." (quoting *Cygan v. Megathlin*, 326 Mass. 732, 733-34 (1951))); *Caggiano v. Marchegiano*, 327 Mass. 574, 579 (1951) ("[I]t is essential to the existence of a contract that its nature and the extent of its obligations be certain.").

Applying these principles, the Supreme Judicial Court has explained that "'an agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto.'" *Lafayette Place Assocs. v. Bos. Redevelopment Auth.*, 427 Mass. 509, 517 (1998) (quoting *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 217 (1935)). At "the stage of 'imperfect negotiation' prior to formalizing a contract," *id.* (quoting *Rosenfield*, 290 Mass. at 217), courts should not interpret an agreement "'so as to make it a valid and enforceable undertaking rather than one of no force and effect,'" *id.* (quoting *Shayeb v. Holland*, 321 Mass. 429, 432 (1947)). "A

7

purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable." *Air Tech. Corp. v. Gen. Elec. Co.*, 347 Mass. 613, 626 (1964).

Dr. Shapiro contends that a valid settlement agreement exists between him and Cynosure because their counsels' email exchange satisfied all three "essential elements" for contract formation: "offer, acceptance, and consideration." *Quinn*, 401 Mass. at 216. First, he argues, the November 30, 2023 email by Cynosure's counsel constituted a valid offer, which stated that he had "authority to try and settle the matter" and framed the three bulleted terms as "Cynosure's counter." ECF 35-1, at 3. Cynosure's counsel also asked Dr. Shapiro's counsel "if this settlement is agreeable to [his] client," and concluded that, "[i]f so [he] will prepare a settlement agreement including a confidentiality provision." *Id.* Second, according to Dr. Shapiro, his counsel's December 5, 2023 reply established acceptance. His counsel specifically responded: "[Dr. Shapiro] will agree to these terms. Accepted." *Id.* Third, Dr. Shapiro contends, the contract was supported by consideration because he agreed to settle the case, including a release of claims (Counts I and II) and a confidentiality clause, in exchange for Cynosure (1) taking back its product, (2) "work[ing] with Greenwood to settle [his] outstanding balance," and (3) applying its $10,000 rebate towards his expenses and legal fees. *Id.* For its part, Cynosure responds that there was no "meeting of the minds" between the parties regarding the material terms of the settlement. ECF 38, at 7. In particular, Cynosure contends that there was no agreement that "it would eliminate Shapiro's debt to Greenwoo[d] at any cost"; rather, Cynosure argues, it committed only to negotiating with Greenwood to attempt to reach a global settlement among all three parties—Dr. Shapiro, Cynosure, *and* Greenwood. *Id.* at 6-7.

Cynosure has the better argument: Dr. Shapiro and Cynosure did not enter into a binding settlement agreement because the second bulleted term of the November 30, 2023 email from Cynosure's counsel was, at best, an unenforceable "agreement to reach an agreement." *Lafayette Place Assocs.*, 427 Mass. at 517. That bullet point states that Cynosure "will work with Greenwood to settle the outstanding balance ow[ed] them." ECF 35-1, at 3. It contained no material terms ascertainable to the parties; Cynosure merely agreed to "work" toward settlement with Greenwood. The language in that bullet point is similar to the unenforceable "agreement to reach an agreement" at issue in *Columbia Plaza Associates v. Northeastern University*, which obligated the parties to "commence negotiations" regarding a parcel of land, 93 Mass. App. Ct. 1113, 2018 WL 2708503, at *3 (2018) (Rule 1:28 decision), or the "agreement to agree" at issue in *PDC-EL Paso Meriden, LLC v. Alstom Power, Inc.*, under which the parties committed to "further good faith negotiations on key facets of materials terms," 66 Mass. App. Ct. 1101, 2006 WL 902253, at *2 (2006) (Rule 1:28 decision).

The December 6, 2023 email from Cynosure's counsel to Greenwood's counsel further underscores that the second bullet point made the alleged settlement an unenforceable agreement to agree. In that email, Cynosure's counsel explained that "[p]art of the agreement includes Cynosure settling the debt owed by Dr. Shapiro and or his company for the return of the equipment," and that "[m]y client is going to reach out to yours to discuss this resolution." ECF 38-3, at 2. This language, which looks ahead to future negotiations between Cynosure and Greenwood, reflects that the November 30, 2023 email was an "agreement to enter into a contract which le[ft] the terms of that contract for future negotiation." *Caggiano*, 327 Mass. at 580. Under Massachusetts law, such agreements are "too indefinite to be enforced." *Id.*

9

The lack of precision in the term "outstanding balance" is likewise telling. Cynosure's November 30, 2023 email did not specify the amount to be paid by Cynosure to resolve Dr. Shapiro's "outstanding balance." ECF 35-1, at 3. At the hearing, the parties expressed different understandings of what the "outstanding balance" might include. Absent more clarity or the "formulae and procedures" that would clarify such an indefinite term, *Lafayette Place Assocs.*, 427 Mass. at 518, courts regularly conclude that an alleged contract is unenforceable. *See, e.g.*, *Giuliano v. Nations Title, Inc.*, 134 F.3d 361 (1st Cir. 1998) (Table) (affirming that the disputed "agreement was an unenforceable 'agreement to agree'" because of, among other reasons, "the parties' failure to include either the exact amount [the defendant] would retain from the lot sale proceeds, or the formula for its calculation"); *Lieberman v. Storagenetworks, Inc.*, 60 Mass. App. Ct. 1118, 2004 WL 360489, at *2 (2004) (Rule 1:28 decision) ("Here, the essential price term of the option contract was apparently left for future negotiation or discussion, and thus the contract is too indefinite to be enforced.").

In short, because the parties did not "progres[s] beyond the stage of 'imperfect negotiation,'" *Situation Mgmt. Sys.*, 430 Mass. at 878 (quoting *Lafayette Place Assocs.*, 427 Mass. at 517), and Cynosure agreed merely to work to settle Dr. Shapiro's outstanding debt with Greenwood, no binding settlement agreement exists between Dr. Shapiro and Cynosure.

## CONCLUSION

For the foregoing reasons, Dr. Shapiro's motion to enforce a settlement agreement is DENIED.

SO ORDERED.

Dated: March 6, 2024

/s/ Julia E. Kobick
United States District Judge

10